264 P.2d 852

**PERRY v. McCONKIE et al.**

No. 7811.

Supreme Court of Utah.

Dec. 18, 1953.

190

Therald N. Jensen, Price, Clyde S. Johnson, Vernal, for respondent.

HENRIOD, Justice.

Appeal from a judgment holding defendant, J. Archie McConkie a constructive trustee of lands for Virtus. F. McConkie's heirs, in a deceit action brought by Archie's sister Pearl against him and his brother William, claiming fraud in concealing a portion of her heritage. Affirmed, but remanded with instructions to order further proceedings as to an accounting in harmony with the observations of this decision. Costs to respondent.

Piercing the fog of controversion here, a few facts appear certain. In 1918, by assignment of certificates of sale of school lands, Virtus acquired equitable, inheritable and transferrable interests in such lands.[1] Archie altered the assignments by the quite simple but equally unorthodox device of erasing his father's name, substituting his own, and by erasing his father's signature on accompanying affidavits, placing his own in the space formerly occupied by the signature of his forebear. Virtus passed to his reward in 1920. The lands were not inventoried in an ensuing probate. In 1924 a decree of distribution, omnibus clause and all, distributed all estate property to his widow. All of the heirs, plaintiff included, previously had quitclaimed to their widowed mother, but Pearl renounced her

Colton & Hammond, Vernal, Dean W. Sheffield, Salt Lake City, for appellants.

1. Young v. Corless, 1920, 56 Utah 564, 191 P. 647; Titles 65–1–41, 43 U.C.A. 1953.

grant as to the lands, the subject of this case, saying never, never would she have deeded had she known her lamented parent owned an interest in such land, whose good earth has nurtured little but family tares, an inquisitive over-the-shoulder concern on the part of her husband,—and possibly hoped for petroleum. The trial court apparently believed her, and therefore the omnibus clause is no defense to this suit.

In 1946, after the probate of 1924, Archie promptly delivered up the certificates of sale and assignments to the State Land Board, mutilations galore, in exchange for patents which he more promptly recorded. The lapse of time is unexplained, unless one might attach unwarranted significance to the demise, shortly prior thereto, of perhaps the last coherent witness to the alterations.

Defendants and their father jointly owned cattle as together they tilled the soil. Some evidence indicates that the boys supplied part of the wherewithal to acquire and operate the properties, under what they said was, and what appears to have been, a partnership. It is not clear what each of this triumvirate owned, but the boys appear to have had a legal interest in the cattle and perhaps an equity in the lands. Whether Virtus raised his voice in protest over the alterations, had an opportunity to do so, or was foreclosed from so doing by the Grim Reaper are matters for conjecture, but his good wife, mother of this erstwhile congenial family, and one of his daughters, differing with plaintiff, deigned to insist that the land belonged to the boys.

At any rate, alteration begat altercation. Plaintiff and her brothers, at the instance of the former, became principals in a legal encounter, in which her mother and sister refused to be drawn, and in which they drew no weapon—to their everlasting credit, and in which counsel on both sides sought but failed to quell the fray. The dollar sign cast an ugly shadow over the family escutcheon, which latter appeared conspicuous by its absence either as an emblem of happy kinship or as a shield against opprobrious epithet.

■ Howsoever brotherly love or sisterly devotion weighted the proverbial scales of justice, fact is that the lower court imposed a constructive trust upon the lands. Alteration of the assignments created nothing and transferred the same. Though Virtus may have intended that the boys should have the lands (a barren waste if the consideration recited in the certificates of sale be a criterion), and may have acquiesced in the crude craftsmanship reflected in the mutilation of the documents, still no interest in the lands was aborning in the alteration other than in the paterfamilias, and none could have passed, since the whole drama was vulnerable to attack and destruction by the statute of frauds.[2]

2. Title 25 U.C.A. 1953.

But an attack upon the patent, valid on its face, which was issued to Archie, albeit the result of the alteration, is reserved unto the sovereign.[3] Since Archie possesses a title which might be voidable or even void, its validity cannot be questioned in this action. The plaintiff, therefore, pursued the proper theory in praying that a constructive trust be imposed on the lands.[4] But in doing so, she made what defendants claim was a collateral attack on the decree of distribution in Virtus's probate. We need not decide the point, since the fact that a collateral attack was or was not made, should not preclude equitable relief, if by evidence she has made a case that would justify the relief prayed had she made no collateral attack. She was an interested party and represented other interested parties and was entitled to relief if she made out a prima facie case, irrespective of the probate decree or any collateral attack upon it.

Although we may have decided otherwise had we been the initial fact finders, we believe and hold that there was sufficient evidence of fraud, particularly because of the alterations and the long wait before the documents were presented to the Land Board, as would justify the lower court's decision,—a decision we cannot disturb under principles enunciated by us in Stanley v. Stanley.[5] Our conclusions are further justified when it is noted that, although fraud must be proved by clear and convincing evidence, we have adopted an exception to the principle in the case where, because of the kinship of the parties, a fiduciary relationship exists, as it does here,—requiring in such cases that the fiduciary assume the burden of proving that his dealings with such beneficiary were fair and in good faith.[6] The record amply reflects that it would not be unreasonable to conclude that defendants had not shouldered such burden, particularly when the whole family, in money matters, depended greatly upon the boys.

Having imposed a trust on the property for the use of Virtus F. McConkie's heirs, we see no escape from the conclusion that the estate of Virtus requires reopening, since the trust imposed for the benefit of the heirs could be subordinate to and subject to possible claims of creditors, taxing authorities and the like. After an accounting has been had, any corpus that may be found to be assets held for the benefit of heirs must be inventoried and appraised before any distribution can be had.

The court erred in excluding evidence 1) that the boys furnished part of

---

3. Thompson, Real Property, Vol. 5, § 2860 et seq., pp. 847 et seq.

4. Ibid.

5. 1939, 97 Utah 520, 94 P.2d 465.

6. Renshaw v. Tracy Loan & Trust Co., 87 Utah 364, 49 P.2d 403, 100 A.L.R. 872; 20 Am.Jur. 146, § 141.

the consideration for the acquisition of the land, which may have created an equitable interest therein in favor of them and 2) that Archie had sold the property requiring that the trust res should be followed. Such errors, however, do not demand reversal of the trial court's imposition of a constructive trust, since the existence of such trust and its nature and extent would be affected by such evidence only as a matter of degree. If Archie transferred the land he may be obliged to take steps to rescind or to account to the probate court for any proceeds received from an abortive sale, for possible effectuation of a legitimate sale under orderly probate procedure, to the purchaser who dealt with him.

Friendly settlement of this controversy might have lent posthumous significance to the memory and appellation of Virtus, whose continued presence in esse, "virtus in arduis," may have resolved domestic difficulties and rendered unnecessary this opinion,—results to have been hoped for and desired.

McDONOUGH and WADE, JJ., concur.

CROCKETT, Justice (concurring).

I agree in affirming the judgment of the lower court that the title taken by James Archie McConkie is charged with a constructive trust for the estate of Virtus F. McConkie.

WOLFE, C. J., not participating.